**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN THE MATTER OF** | ) | |
| **THE EXTRADITION OF** | ) | **No. 22 CR 615** |
| | ) | |
| **NERIJUS TAUTVYDAS** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| | ) | **January 27, 2023** |
| | ) | |

**MEMORANDUM OPINION and ORDER**

The Republic of Lithuania ("Lithuania") seeks the extradition of Nerijus Tautvydas pursuant to the Extradition Treaty Between the United States and the Republic of Lithuania, U.S.-Lith., Oct. 23, 2001, S. Treaty Doc. No. 107-4 (2002) ("Treaty with Lithuania"), and the Protocol on the Application of the Agreement on Extradition Between the United States and the European Union to the Extradition Treaty Between the Government of the United States and the Government of the Republic of Lithuania, U.S.-Lith., June 15, 2005, S. Treaty Doc. No. 109-14 (2006) (together, the "Extradition Treaty"). Under the Extradition Treaty, the United States and Lithuania "agree to extradite each other, pursuant to the provisions of th[e] Treaty, persons whom the authorities in the Requesting State have charged with or convicted of an extraditable offense." (Treaty with Lithuania at *6.) Lithuania seeks to prosecute Tautvydas for various violations of its criminal code, and formally charged Tautvydas with these offenses on November 4, 2022. (See R. 1 at 1; R. 10 at 2.) A Lithuanian court then issued a warrant for his arrest three days later. (R. 10 at 2.)

But because Tautvydas was living in the United States, the Lithuanian government asked the United States ("the government") to provisionally arrest Tautvydas with a view towards his extradition. The government in turn submitted a criminal complaint to this court on November 21, 2022, seeking to arrest Tautvydas pursuant to 18 U.S.C. § 3184. (R. 1 at 1.) This court issued a warrant for Tautvydas's arrest that day, (R. 5), and the government took him into custody the following day, (R. 6). Following the arrest, the government seeks to detain Tautvydas[1] pending a future hearing on the certification of his extraditability.[2] (R. 10.) For the following reasons, the request is denied:

## Background

Lithuania formally charged Tautvydas with the following violations of its criminal code: (1) criminal association; (2) unlawful possession of narcotic or psychotropic substances for the purpose of distribution thereof or, in the alternative, unlawful possession of a large quantity of narcotic or psychotropic substances; (3) smuggling; and (4) criminal liability for crimes related to the possession of narcotic, psychotropic, toxic, or highly active substances. (See R. 1 at 1.) In support of Tautvydas's provisional arrest on these charges, Lithuanian authorities submitted information and statements regarding the allegations against him. (Id. at ¶ 5.) According to those statements, as of 2014, Tautvydas formed an organized criminal

---

[1] The court ordered Tautvydas's detention while the government's request is pending. (R. 7.)

[2] The Lithuanian government has represented that it will "submit a formal request for extradition . . . within the time required under the Treaty." (R. 10 at 6, n.3.)

group called Džerkiniai (the "OCG"), to smuggle drugs internationally.[3]  (Id. at ¶ 8(a).)  Lithuania further states that Tautvydas and the OCG arranged to acquire and store 3,480 kilograms of hashish from Lebanon and transport it through Europe to the Czech Republic between August 2020 and November 2020.  (Id. at ¶ 8(d).) Upon arrival to the Czech Republic, the OCG hid at least 1,480 kilograms of hashish within marble slabs for further trafficking in Europe.  (Id. at ¶ 8(e).)  Prior to initiating the trafficking, however, Tautvydas tested the quality of the hashish. (Id. at ¶ 8(f).)  Finding the quality poor, Tautvydas directed that the OCG instead transport the hashish to Russia, and thus the OCG transported the hashish from the Czech Republic through Europe using a road tractor and connected semi-trailer. (Id. at ¶¶ 8(f)-(g).)  Lithuania supports these claims with Tautvydas's electronic messages that include photos of the exterior and interior of the semi-trailer and the marble slabs.  (Id. at ¶ 8(j).)

On or about December 31, 2020, the OCG transported the hashish through Lithuania, and in late January 2021, crossed the Lithuanian-Latvian border without submitting the cargo to customs control.  (Id. at ¶ 8(h)-(i).)  The semi-trailer continued toward a checkpoint at the Latvian-Russian border.  (Id. at ¶ 8(k).)  Near the border, however, the driver of the semi-trailer "noticed cracks in some of the

---

[3]  The allegations are supported by the following sources described by Lithuanian authorities but not yet received: (1) electronic communications between Tautvydas and other OCG members; (2) wiretap recordings of Tautvydas and other OCG members; (3) physical surveillance; (4) police reports; (5) witness statements; (6) camera footage; (7) hotel records; (8) laboratory tests and forensic examinations; and (9) records and evidence from other countries where OCG operated.  (See id. at ¶ 8(b).)

marble slabs in which hashish was concealed and alerted the OCG."  (Id. at ¶ 8(l).)

Tautvydas and other OCG members discussed the cracked slabs and shared photos

of these slabs.  (Id. at ¶ 8(m).)  In February 2021, the OCG constructed new slabs to

replace the damaged ones, (id. at ¶ 8(o)), and moved the hashish to those slabs, (id.

at ¶ 8(p)).  But the new slabs accommodated less hashish than the prior slabs, such

that the OCG could continue to transport only about 975 kilograms of hashish.  (Id.

at ¶¶ 8(p)-(q).)  In mid-March 2021, Latvian authorities intercepted the OCG's semi-

trailer, discovered and tested the substance concealed within the slabs, and

determined it to be hashish.  (Id. at ¶¶ 8(r)-(s).)

Twenty months later, on November 4, 2022, the Lithuanian government

charged Tautvydas with the above-mentioned offenses.  Tautvydas was then living

in the United States with his wife and two children, who are 12 and 13 years old.

(R. 18 at 6, 9.)  In addition to financially supporting his family working as President

and Operations Manager at ATN-Trans, Inc. ("ATN" or the "Company"), a trucking

company, Tautvydas serves as a caretaker for his wife, who suffered a spinal cord

injury causing her "incomplete paralysis" following a 2016 car accident.  (R. 18 at 9-

10.)  Among other things, Tautvydas helps his wife by "assisting her movement,

repositioning her, performing daily activities for her, driving her [to] physical

therapy and doctor's appointments, as well as virtually any other activity

imaginable where some [type] of mobility is necessary."  (Id.)

Five individuals together submitted a letter in support of Tautvydas's request

for release on bond, describing him as "a great friend, father, husband and a

member of [their] community," and "a role model and a positive example for his children," who "depend on him financially and emotionally." (R. 18-1.) The letter also notes that Tautvydas "loves and takes care of his wife unconditionally." (Id.) An ATN representative also submitted a letter describing the "irreplaceable value" that Tautvydas provides to the Company, attesting to Tautvydas's "qualities of a great boss to his employees and partners," and describing him as "responsible," "honest," and "show[ing] a great deal of care to everyone he encounters." (Id.)

## Legal Standard

Under 18 U.S.C. § 3184, a judicial officer has the authority to issue an arrest warrant for an individual sought for extradition, and for whom a related complaint has been filed. A hearing is subsequently conducted to determine whether evidence exists "to sustain the charge under the provisions of the proper treaty." *Id.*; *In re Extradition of Jarosz*, 800 F. Supp. 2d 935, 939 (N.D. Ill. 2011). Should the judicial officer decide that the evidence is sufficient to sustain such charges, the officer "certif[ies] the same" and is to detain the person until surrender to the foreign authority is made. 18 U.S.C. § 3184. Thereafter, "[t]he Secretary of State has sole discretion to determine whether or not extradition should proceed further with the issuance of a warrant of surrender." *Venckiene v. United States*, 929 F.3d 843, 849 (7th Cir 2019) (internal quotation marks omitted) (citing *Noeller v. Wojdylo*, 922 F.3d 797, 803 (7th Cir 2019)).

As the Lithuanian government has not yet filed a formal extradition request, the issue is whether Tautvydas can be released from detention until the formal

request is filed and adjudicated. A defendant in extradition proceedings may be provisionally arrested and detained in advance of receiving a formal extradition request "upon the request of the authority competent to request the surrender of such fugitive addressed to the authority competent to grant such surrender," so long as the request is accompanied with a statement that the issuing authority has charged the individual with the crime underlying the extradition request. 18 U.S.C. § 3187; *see also* Treaty with Lithuania, at *9 ("In case of urgency, the Requesting State may request the provisional arrest of the person sought pending the presentation of the request for extradition."). The Supreme Court established a presumption against bail in extradition proceedings, holding in *Wright v. Henkel,* 190 U.S. 40, 63 (1903), that "bail should not ordinarily be granted in cases of foreign extradition." Limiting access to bail in this manner protects the United States from the embarrassment that would result if the defendant absconded post-detention, and, relatedly, protects "the ability of the United States to obtain extradition of its fugitives." *In re Extradition of Molnar*, 182 F. Supp. 2d 684, 687 (N.D. Ill. 2002). *Wright* stipulates, however, that courts are not foreclosed from extending bail where "special circumstances" exist. 190 U.S. at 63. Courts interpreting this decision have assigned defendants the burden of demonstrating that "special circumstances" warrant conditional release. *United States v. Leitner*, 784 F.2d 159 (2d Cir. 1986); *Molnar*, 182 F. Supp. 2d at 686-87 (citing *Salerno v. United States*, 878 F.2d 317 (9th Cir. 1989)).

The Extradition Treaty provides further information relevant to the question of bail. As previously noted, Article 11(4) of the Extradition Treaty allows the release of a detainee if the formal request for extradition and supporting documentation have not been received "within sixty days from the date of provisional arrest." (Treaty with Lithuania at *9.)

## Analysis

The court finds that Tautvydas should be released on conditional bail pending receipt of Lithuania's formal extradition request and supporting documents.

### A. Liberal Approach

As the government asserts, a strong presumption against bail exists in extradition proceedings. (R. 10 at 18 (citing *Matter of Extradition of Noeller*, No. 17 CR 664, 2017 WL 6462358, at *3 (N.D. Ill. Dec. 19, 2017) (quotations omitted)).) Indeed, defendants face a high burden in demonstrating that bail is warranted in such cases, and courts rarely grant the same. *See United States v. Howells*, No. 20 CR 50033, 2020 WL 6822980, at *1 (N.D. Ill. Nov. 20, 2020) (citing *Matter of Extradition of Budrys*, No. 19 M 179, 2019 WL 1958566, at *2 (N.D. Ill. May 2, 2019)). The parties agree that a defendant seeking bond in an extradition case must show that he is neither a flight risk nor a danger to the community. (See R. 10 at 19-20 (citing *Budrys*, 2019 WL 1958566, at *2 (additional citations omitted); R. 18 at 3-10 (citing *Molnar*, 182 F. Supp. 2d at 687).) If the defendant is successful in so doing, the court then determines whether "special circumstances"

warrant his release. (R. 10 at 19-20 (citing *Budrys*, 2019 WL 1958566 at \*2); R. 18 at 5-10 (citing *Matter of Extradition of Schumann*, No. 18 CR 283, 2018 WL 4777562 (N.D. Ill. Oct. 3, 2018)).

The government concludes its discussion of the relevant legal framework there. But Tautvydas argues for a more lenient "special circumstances" analysis, citing *In re Extradition of Molnar*, 182 F. Supp. 2d 684 (N.D. Ill. 2002). (R. 18 at 4.) The court agrees that application of the liberal approach is appropriate in this case given the procedural parallels. In *Molnar*, the Republic of Hungary requested the defendant's provisional arrest and stated that "a regular diplomatic request for extradition of the defendant [would] be made in conformity with [the governing treaty.]" *Molnar*, 182 F. Supp. 2d at 685-86. The government arrested the defendant, but he subsequently filed a request for release under bail pending receipt of the formal extradition request. *See id.* at 686. After outlining the presumption against bail in extradition cases, the *Molnar* court determined that the defendant was not a flight risk. *Id.* at 686-87. The court went on to explain that because the defendant was under provisional arrest and was not urgently apprehended, it chose "to follow a more liberal view in determining whether [the defendant was] to be released under bail." *Id.* at 688. The liberal approach, according to the *Molnar* court, entails viewing the circumstances the defendant deems "special" "collectively rather than singularly." *Id.* at 689. The court ultimately ordered the defendant's release on bond, finding that the following circumstances—when analyzed liberally—constituted "special circumstances":

8

the financial assistance he currently gives to his seriously ill mother who resides in Hungary, and who depends on money he sends to her; the provisional nature of his arrest; that he is not and never has been a fugitive from justice; the possible delay in the extradition proceedings that is inherent in the provisional arrest scenario; the fact that criminal charges were initially dropped against him, and only later instated after he had left Hungary . . . and the dedication of friends who, by showing their willingness to post a home as security for his release, vouch for his compliance with any Order of Release.

*Id.*

Tautvydas argues that the liberal approach should be applied in this case in part because "there is absolutely no showing of urgency justifying the provisional arrest in the first instance." (R. 18 at 5.) But whether a provisional arrest was appropriate is distinct from the issue of whether conditional release is available post-detainment. In stating that "[s]ome courts have discussed an issue of 'urgency' in the provisional arrest situation," *Molnar* cites to cases deciding whether provisional arrest was appropriate in the first instance. These cases do not explicitly interpret the provisional arrest's urgency as a condition precedent to applying the special circumstances test. 182 F. Supp. 2d at 687 (citing *United States v. Messina*, 566 F. Supp. 740, 74[3-45] (E.D.N.Y. 1983); *Caltagirone v. Grant*, 629 F.2d 739, 744, n.10 (2d Cir. 1980)); *see also Matter of Extradition of Russel*, 805 F.2d 1215, 1218 (5th Cir. 1986); *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 165, 174-75 (S.D.N.Y. 2009). Therefore, the court clarifies that the liberal framework is available simply because of the procedural posture. Because

Tautvydas does not request conditional release based on an improper provisional arrest, the question of urgency is not at issue.[4]

**B.    Danger to the Community and Risk of Flight**

Before considering whether "special circumstances" warrant Tautvydas's release on bond in this case, the court must find that Tautvydas is neither a danger to the community nor a flight risk. *Molnar*, 182 F. Supp. 2d at 687; *Schumann*, 2018 WL 4777562, at *6; *Noeller*, 2017 WL 6462358, at *4. Tautvydas argues that he is not a danger to the community, noting that the crimes he has been charged with are non-violent offenses, and that the complaint does not note that he had engaged in any other criminal conduct. (R. 18 at 5-6.) The court agrees and the government does not argue otherwise. *See Schumann*, 2018 WL 4777562 at *6 (finding that defendant did not pose a threat to his community given the lack of information suggesting he had engaged in criminal activity since the alleged misconduct occurred). Further, the letters attesting to Tautvydas's character tend to suggest that Tautvydas has provided substantial support of differing varieties to his family, community, and professional colleagues. (See R. 18-1; R. 18-2.) Based on the information before it, Tautvydas does not pose a danger to the community.

---

[4] The court notes, though, that it disagrees that Tautvydas's provisional arrest was not justified by urgency at the time it was effectuated. (See R. 18 at 5.) In determining whether urgency warrants a prospective extraditee's provisional arrest and detention, courts afford considerable deference to determinations of urgency expressed by the requesting authority "as a matter of comity." *United States v. Messina*, 566 F. Supp. at 745. The government explained to the court that Lithuania sought to arrest Tautvydas provisionally because it planned to arrest the multiple co-defendants simultaneously. The government expressed concerns that failing to do so would have elevated the risk of flight had he learned of his affiliates' arrests.

As to the risk of flight, there is no single test for determining whether a defendant awaiting an extradition hearing poses such risk.  However, courts have considered the following factors when evaluating this question: (1) whether the defendant fled upon learning of the charges against him, *see, e.g.*, *Leitner*, 784 F.2d at 161; *United States v. Ramnath*, 533 F. Supp. 2d 662, 670 (E.D. Tex. 2008); (2) whether, prior to departure, the defendant reasonably could have believed that he would be subject to criminal charges in the country from which the defendant departed, *see, e.g.*, *Budrys* 2019 WL 1958566 at *2; (3) the defendant's criminal history, *see, e.g.*, *Molnar*, 182 F. Supp. 2d at 686-87; (4) the severity of the charges, *see, e.g.*, *Howells*, 2020 WL 6822980, at *2; (5) the resources available to the defendant to enable flight, *see United States v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 63-64 (D. Mass. Aug. 17, 2010); (6) the defendant's ties to foreign jurisdictions, *see Matter of Extradition of Nacif-Borge*, 829 F. Supp. 1210, 1221-22 (D. Nev. 1993); and (7) the defendant's ties to the community in which he or she currently resides, including home or business ownership, *see, e.g.*, *Ramnath*, 533 F. Supp. 2d at 670.

The government argues that Tautvydas's absence from Lithuania in the wake of his alleged criminal conduct itself renders him a flight risk if granted bail, and the fact that there is no evidence that he was aware of pending charges in Lithuania prior to his arrest is inconsequential, including because he has not returned to face the charges.  (R. 18 at 6; R. 10 at 23.)  The government also argues that because Tautvydas now knows of the charges against him in Lithuania, he has "significant incentive to flee," and asserts that Tautvydas attempted to flee from

law enforcement when they approached his home to arrest him—a point Tautvydas disputes. (R. 10 at 23; R. 18 at 7-8.) Further, the government notes that Tautvydas could face life imprisonment if convicted, which it claims further incentivizes Tautvydas's flight. (Id. at 23-24.)

That Tautvydas left Lithuania following his alleged involvement in an illegal transfer of hashish across European borders is indeed a concern. Further, Tautvydas was reasonably on notice that a criminal investigation and subsequent prosecution might be imminent after the Latvian authorities' interception of the OCG's semi-trailer, assuming he was indeed involved. Finally, the charges Tautvydas faces in Lithuania are serious, as is the possible sentence if found guilty. However, "[t]he presence of some evidence of flight risk does not settle the matter;" the court must consider the full scope of evidence. *Ramnath*, 533 F. Supp. 2d at 670.

In so doing, the court notes that while the maximum sentence Tautvydas could face is severe, this factor alone is insufficient to find that Tautvydas is a flight risk. *See, e.g.*, *Ramnath*, 533 F. Supp. 2d at 667-68, 669-70 (where defendant was charged with involuntary manslaughter and facing a possible maximum punishment of life imprisonment, and was released on bond); *Duca v. United States*, No. CV-95-713, 1995 WL 428636, at *1-2 (E.D.N.Y. July 7, 1995) (where defendant, despite already being sentenced to 19 years in an Italian prison and a 200 million lire fine, was released on bond pending his extradition hearing). Moreover, because Tautvydas's provisional arrest occurred before learning of the pending charges

against him in Lithuania, the court cannot hold his failure to return to Lithuania against him. The record also does not indicate that Tautvydas has any criminal history. Nor is there evidence that Tautvydas has the ability or resources to disappear. *See Castaneda-Castillo*, 739 F. Supp. 2d at 63-64. To the contrary, Tautvydas is fully employed and supports his two minor children and wife with significant mobility constraints here in Illinois. Further, although the record indicates that Tautvydas has lived in the United States for a relatively short period of time—about three years—courts have found defendants have sufficient ties to the community to warrant release on bail on less time. *See, e.g.*, *Ramnath*, 533 F. Supp. 2d at 669 (where the defendant's residence in the community at issue, "albeit for less than a year," was sufficient to establish "strong community and family ties"). Finally, the court cannot give credence to the government's unsupported claim that Tautvydas has ties to foreign jurisdictions because of the OCG's status as an international criminal organization. (R. 10 at 23.) While the court acknowledges that this decision is a close one, considering the relevant factors in the aggregate and the information currently before it, the court finds that Tautvydas does not pose a risk of flight.

## C. Special Circumstances

Nevertheless, bail is only available to Tautvydas upon his showing of "special circumstances" warranting his release. *Schumann*, 2018 WL 4777562 at *6; *Leitner*, 784 F.2d at 160 (citations omitted). "Special circumstances" is an amorphous concept that "require[s] a cautious judgment by the judge, taking into

account the totality of the facts and having a healthy respect for [the requesting] country's international treaty agreements." *Molnar*, 182 F. Supp. 2d at 688. Courts have deemed the following circumstances "special" for this purpose:

> a high probability of success, serious deterioration of health, or unusual delay. *Salerno*, 878 F.2d 317 (citing cases); reason to believe underlying charges cannot be supported under Treaty provisions, or impropriety in charge or procedure. *In the Matter of the Extradition of Anne Hamilton-Byrne*, 831 F. Supp. 287, 290 (S.D.N.Y. 1993); combined factors of lengthy extradition hearing, lack of prior record, allergic reaction to soap used in laundered clothes at correctional facilities, and inability to carry out religious rituals. *U.S. v. Taitz*, 130 F.R.D. at 444 (S.D. Cal. 1990); promoting harmony between the supporters of Catholics in Northern Ireland and those who's [sic] interests are otherwise. *In the Matter of the Requested Extradition of Kirby*, 106 F.3d 855, 856 (9th Cir. 1996); the availability of bail for crime charged in the demanding country. *In the Matter of the Extradition of Kamel Nacif-Borge*, 829 F. Supp. at 1221.

*Id.* at 688-89. Notably, a defendant's need to care for a disabled or severely ill spouse can also constitute a "special circumstance." *See, e.g.*, *Matter of Extradition of Netzky*, No. 3:20-mj-220, 2022 WL 2315976, at *1 (D. Or. June 28, 2022); *Duca*, 1995 WL 428636, at *2.

The government states that it is "unaware of any 'special circumstances' that would justify bail in this case." (R. 10 at 24.) For his part, Tautvydas points to his family obligations, including his role as his wife's caretaker, and stating that his "work at ATN provides the necessary income for support" of his two minor children, whom he drives to school and to extracurricular activities each day. (R. 18 at 9-10.)

The court acknowledges that detention imposes a burden on Tautvydas and on the members of his family but it cannot consider the care he provides to his minor children a "special circumstance" that warrants his release. Indeed, "[a]

defendant's incarceration regularly creates difficulties for him and his family," rendering this particular circumstance a common one that is to be expected, and not itself "special." *Budrys*, 2019 WL 1958566 at *6 (citations omitted); *see also United States v. Snyder*, No. 13–7972–MJ, 2013 WL 1364275, at *7 (D. Ariz. 2013) ("The record before the Court does not indicate that the care Defendant provides is anything other than ordinary childcare, a factor that would likely be present in many cases.").

But as noted, caretaking responsibilities for spouses with serious injuries or illnesses can be "special." In *Netzky*, the court granted the defendant bail given the "cumulative effect" of special circumstances, including "government-certified care of a disabled spouse and primary care of a young daughter, rendered more critical in light of Covid-19." 2022 WL 2315976 at *1. And in *Duca*, the court released the defendant on bail pending his extradition hearing to allow him to resume caring for his wife, who was in the advanced stages of Alzheimer's Disease and unable to care for herself. 1995 WL 428636, at *2.

Tautvydas states that he "provides an immense amount of support" to his wife, who has incomplete paralysis because of her spinal cord injury. (R. 18 at 9.) Given the dearth of information disclosed to date about the nature of his wife's injury and physical state, it is difficult to measure with certainty the care Tautvydas provides his wife against that required of the defendants in *Duca* and *Netzky*. But given the liberal approach the court adopts here, the court finds that Tautvydas's role as his wife's caretaker is a "special circumstance" that warrants

his provisional release while the court awaits receipt of the formal extradition request, particularly when considered in conjunction with the following circumstances that, although not "special" on their own, support Tautvydas's release: (1) his role as sole provider for his family given his wife's disability; (2) the need to care for his two minor children, rendered more critical because of his wife's disability; and (3) the lack of a criminal record independent of the present charges. Bolstering the court's decision is the fact that 60 days have already passed since Tautvydas's arrest. (R. 6; R. 7.) Given that the Extradition Treaty allows for the discharge of a person provisionally detained absent receipt of the formal extradition request within the defined 60-day period, the court further finds it appropriate to release Tautvydas in this instance. *See* Treaty with Lithuania, at *9.

## Conclusion

For the foregoing reasons, the government's request for continued detention is denied.

ENTER:

**Young B. Kim**
**United States Magistrate Judge**