UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

NERIJUS TAUTVYDAS

No. 22 CR 615

Hon. Young B. Kim

## PETITION FOR CERTIFICATION OF EXTRADITION AND INCORPORATED MEMORANDUM OF LAW

JOHN R. LAUSCH, JR.
United States Attorney
For the Northern District of Illinois
219 S. Dearborn Street, Fifth Floor
Chicago, Illinois 60604
(312) 353-5300

JONATHAN L. SHIH
Assistant United States Attorney

# **TABLE OF CONTENTS**

TABLE OF CONTENTS.........................................................................................i

TABLE OF AUTHORITIES ................................................................................ii

  I.   Introduction ................................................................................................. 1

  II.  Background ................................................................................................... 2

     A.   Procedural Background.......................................................................... 2

     B.   Factual Background ............................................................................... 3

  III. Discussion .................................................................................................... 6

     A.   General Principles of Extradition.......................................................... 6

     B.   The Requirements for Certification Are Satisfied ................................ 8

     C.   Documentary Evidence Submitted by Lithuania is Alone Sufficient for Certification ....................................................................................... 18

     D.   Rule of non-inquiry............................................................................. 20

  IV. CONCLUSION.......................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

Cases

*Arias v. Warden*, 928 F.3d 1281 (11th Cir. 2019) ....................................................... 10

*Austin v. Healey*, 5 F.3d 598 (2d Cir. 1993) ................................................................. 9

*Bingham v. Bradley*, 241 U.S. 511 (1916)............................................................. 19, 20

*Bovio v. United States*, 989 F.2d 255 (7th Cir. 1993) ................................................. 18

*Caplan v. Vokes*, 649 F.2d 1336 (9th Cir. 1981) ............................................. 15, 16, 17

*Charlton v. Kelly*, 229 U.S. 447 (1913)........................................................................ 20

*Collins v. Loisel*, 259 U.S. 309 (1922) ....................................................... 6, 11, 18, 20

*Collins v. Loisel*, 262 U.S. 426 (1923) ........................................................................ 19

*DeSilva v. DiLeonardi*, 125 F.3d 1110 (7th Cir. 1997)............................................... 11

*DeSilva v. DiLeonardi*, 181 F.3d 865 (7th Cir. 1999).................................................. 18

*Eain v. Wilkes*, 641 F.2d 504 (7th Cir. 1981) ...................................................... passim

*Emami v. U.S. Dist. Ct.*, 834 F.2d 1444 (9th Cir. 1987)............................................... 18

*Factor v. Laubenheimer*, 290 U.S. 276 (1933) ...................................................... 8, 12

*Fernandez v. Phillips*, 268 U.S. 311 (1925).................................................................. 8

*Gerstein v. Pugh*, 420 U.S. 103 (1975) ................................................................. 14, 15

*Grin v. Shine*, 187 U.S. 181 (1902)...................................................................... 8, 12

*In re Extradition of Jarosz*, 800 F. Supp. 2d 935 (N.D. Ill. 2011) .............................. 19

*In re Extradition of Ortiz*, 444 F. Supp. 2d 876 (N.D. Ill. 2006) ............... 8, 11, 19, 20

*In re Extradition of Powell*, 4 F. Supp. 2d 945 (S.D. Cal. 1998)................................. 19

*In re Extradition of Salas*, 161 F. Supp. 2d 915 (N.D. Ill. 2001).............................. 20

*In re Extradition of Wadge*, 15 F. 864 (S.D.N.Y. 1883) ............................................ 20

*In re Kaine*, 55 U.S. 103 (1852) ................................................................................ 21

*Koskotas v. Roche*, 931 F.2d 169 (1st Cir. 1991) ........................................................ 21

*Martin v. Warden, Atlanta, Penitentiary*, 993 F.2d 824 (11th Cir. 1993) ................... 2

*Martinez v. United States*, 828 F.3d 451 (6th Cir. 2016) ............................................ 12

*McElvy v. Civiletti*, 523 F. Supp. 42 (S.D. Fla. 1981) .................................... 12, 16, 17

*Neely v. Henkel*, 180 U.S. 109 (1901) ........................................................................ 18

*Prasoprat v. Benov*, 421 F.3d 1009 (9th Cir. 2005) ............................................. 19, 21

*Quinn v. Robinson*, 783 F.2d 776 (9th Cir. 1986) ...................................................... 15

*Simmons v. Braun*, 627 F.2d 635 (2d Cir. 1980) ....................................................... 19

*United States v. Kin-Hong*, 110 F.3d 103 (1st Cir. 1997) ............................................ 7

*United States v. Nolan*, 651 F. Supp. 2d 784 (N.D. Ill. 2009) ............................... 9, 10

*United States v. Wiebe*, 733 F.2d 549 (8th Cir. 1984) .................................................. 6

*Valentine v. United States ex rel. Neidecker*, 299 U.S. 5 (1936) .................................. 8

*Venckiene v. United States*, 929 F.3d 843 (7th Cir. 2019) ................................. 7, 8, 20

*Venckiene*, 929 F.3d ................................................................................................... 19

*Zanazanian v. United States*, 729 F.2d 624 (9th Cir. 1984) ...................................... 19

## Statutes

18 U.S.C. § 3184 ................................................................................................. passim

18 U.S.C. § 371 ............................................................................................................ 13

18 U.S.C. § 545 ............................................................................................................ 14

21 U.S.C. § 952 ............................................................................................................ 14

21 U.S.C. §§ 841(a)(1) ................................................................................................ 13

## Rules

Fed. R. Crim. P. 1(a)(5)(A) ......................................................................................... 19

Fed. R. Evid. 1101(d)(3) .............................................................................................. 18

## Other Authorities

U.S. -Lith., June 15, 2005, S. Treaty Doc. No. 109-13 (2006) ..................................... 1

U.S. -Lith., Oct. 23, 2001, S. Treaty Doc. No. 107-4 (2002).......................................... 1

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully petitions this Court for certification of extradition, and submits this incorporated memorandum of law in support.

## I.   INTRODUCTION

On November 21, 2022, the United States filed an initial complaint and obtained an arrest warrant for fugitive Nerijus Tautvydas ("Tautvydas") based on the Republic of Lithuania's ("Lithuania") request pursuant to the Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Lithuania, U.S.-Lith., Oct. 23, 2001, S. Treaty Doc. No. 107-4 (2002), and the Protocol on the Application of the Agreement on Extradition Between the United States of America and the European Union to the Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Lithuania, U.S.-Lith., June 15, 2005, S. Treaty Doc. No. 109-13 (2006) (collectively, the "Extradition Treaty").  In this matter, the United States acts in fulfillment of its treaty obligations to the Lithuanian government.

Lithuania has submitted a formal request for Tautvydas's extradition and surrender, supported by appropriate documents, to the United States Department of State.  By statute, this Court must hold a hearing to consider the evidence of criminality presented by Lithuania and to determine whether it is "sufficient to sustain the charge under the provisions of the proper treaty or convention."  18 U.S.C. § 3184.

The United States respectfully submits this memorandum to set forth the procedural and factual background of the case and to explain the legal standards and protocols that govern extradition proceedings under 18 U.S.C. § 3184. As detailed herein, the evidence submitted by Lithuania fulfills the relevant legal and treaty requirements. The Court should therefore "certify the same" to the Secretary of State, who will decide whether to surrender the fugitive "according to the treaty."[1] 18 U.S.C. § 3184.

## II. BACKGROUND

### A. Procedural Background

Lithuania seeks the extradition of Tautvydas for prosecution on the offenses of: (1) Criminal Association, in violation of Articles 249(3) and 25(4) of the Criminal Code of the Republic of Lithuania ("CCL"); (2) Unlawful Possession of Narcotic or Psychotropic Substances for the Purpose of Distribution Thereof or Unlawful Possession of a Large Quantity of Narcotic or Psychotropic Substances, in violation of Article 260(3) of the CCL; and (3) Smuggling, in violation of Article 199(4) of the CCL. (Rec. Doc. 21, at 2.)

The Government of Lithuania charged Tautvydas with these offenses by Prosecutor's Resolution on November 4, 2022. (*Id.*) On November 7, 2022, a judge in the District Court of Vilnius City, Lithuania, issued an arrest warrant for Tautvydas.

---

[1] After the Court has completed its "limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender." *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 829 (11th Cir. 1993). "The Secretary exercises broad discretion and may properly consider myriad factors, including humanitarian ones, affecting both the individual defendant as well as foreign relations, which the extradition magistrate may not." *Id.*

On November 21, 2022, the government submitted a complaint pursuant to 18 U.S.C. § 3184 to the Court.  (Rec. Doc. 1.)  On that day, the Court issued a warrant for Tautvydas's provisional arrest.  Tautvydas was arrested in the Northern District of Illinois on the following day, November 22, 2022.  (Rec. Doc. 6.)  Initially, the Court ordered Tautvydas detained pending further order of the Court.  (Rec. Doc. 7.)  On January 27, 2023, the Court ordered Tautvydas released on bond on January 31, 2023.  (Rec. Doc. 20.)  On January 30, 2023, the government filed a motion to reconsider that order.  (Rec. Doc. 23.)  On January 31, 2023, the Court ordered that Tautvydas submit a response to the government's motion to reconsider, and consequently, Tautvydas currently remains in the custody of the United States Marshal's Service.  (Rec. Doc. 24.)

### B. Factual Background

The extradition request is attached hereto as Exhibit B, and additional information submitted by Lithuania to supplement the extradition request is attached hereto as Exhibit C.[2]  The extradition request and supplementary information set forth the following facts for the Lithuanian criminal charges for which Tautvydas's extradition is sought.  In summary, Tautvydas was one of the organizers and leaders of an organized criminal group called *Džerkiniai* (the "OCG"), which, *inter alia*, trafficked in controlled substances in Europe and elsewhere.  The OCG included members throughout Europe, including Lithuania, Russia, the Czech Republic,

---

[2] These records were also attached to the government's motion for reconsideration (Rec. Doc. 23), as Exhibits B and C.

Germany, and Latvia, and Tautvydas was a significant member of the group with supervisory authority. (Exh. B at 6, 51.) Intercepted encrypted text messages and witness testimony showed that Tautvydas held a "leading position" in, among other things, coordinating the OCG's criminal activities and handling "any arising problems." (Exh. C at 15-16.) In particular, intercepted encrypted text messages and witness testimony showed that Tautvydas, in concert with other members and leaders of the OCG, was responsible for, among other things, assessing the quality of controlled substances obtained by the OCG, selecting a secure route for and preparing customs-related documents for the transportation of the drugs, coordinating the construction of hiding places in stone slabs to conceal the drugs, locating and acquiring premises and equipment to store the drugs, and repackaging and loading the drugs into the hiding places in the stone slabs. (*Id.* at 16.) Intercepted encrypted text messages and witness testimony further revealed that Tautvydas communicated with other members of the OCG, as well as with individuals outside of the group, to organize the acquisition, storage, transport, and concealment of narcotic substances trafficked by the OCG. (*Id.* at 16.)

Additionally, the OCG maintained a common fund, known as the "obshchak," which the members used to finance their illegal activity, including drug trafficking. (Exh. B at 6; Exh. C at 14-15.) According to intercepted encrypted text messages and witness testimony, members of the OCG, including Tautvydas, paid into the fund a portion of the proceeds of criminal activity (or, if there were no proceeds, a fixed amount), and shared the profits. (Exh. C at 14.) Intercepted encrypted text messages

also revealed that Tautvydas regularly directed other members of the organization to execute transactions from the common fund, including directing that money be paid to particular individuals or transported to "certain places for concealment." (*Id*. at 15.)

Moreover, intercepted text messages and witness information also revealed that Tautvydas was personally involved in arranging for the acquisition and transportation of controlled substances, including approximately 3,480 kilograms of hashish, between August 2020 and November 2020. (Exh. B at 7.) The OCG obtained the 3,480 kilograms from a source in Lebanon, and they initially intended to transport it through Europe, including to the Czech Republic. (*Id*.) Tautvydas received photographs of the hashish from another individual in August 2020 in connection with the acquisition. (*Id*. at 55-56.)

After the load arrived in the Czech Republic, members of the OCG split the drugs into two shipments, one part to remain in the Czech Republic, and the remaining approximately 1,480.4 kilograms to be transported elsewhere in Europe. (*Id*. at 7.) In December 2020, Tautvydas traveled to Prague, Czech Republic, to inspect the hashish. Tautvydas determined that the quality was too low for the Scandinavian market but would be appropriate for the Russian market. (*Id*. at 56-57.) Subsequently, Tautvydas and other members of the OCG arranged for the 1,480.4 kilograms of hashish to be concealed within stone slabs. (*Id*. at 58-59.)

In January 2021, members of the OCG transported the hashish, concealed within the aforementioned stone labs, to Latvia. (*Id*. at 61.) There, the OCG learned

that the slabs in which the hashish was concealed were broken. (*Id.*) Tautvydas and other members of the OCG moved the damaged slabs to a rented location in Latvia and arranged to obtain new slabs, in which the hashish was then repackaged. (*Id.* at 65.) Tautvydas personally "smashed granite slabs in which narcotic substances were hidden, re-vacuumed the narcotic substances, and transferred them into new hiding places." (*Id.* at 65.) On March 12, 2021, Latvian police officers interdicted the shipment, resulting in the seizure of 974.953 kilograms of hashish. (*Id.*) Laboratory analyses of the substance confirmed the presence of hashish. (*Id.* at 66.)

III.  DISCUSSION

A.  **General Principles of Extradition**

The extradition process is unique and differs from a criminal case. Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge." 18 U.S.C. § 3184. At the extradition hearing, the Court should consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification, as defined in the treaty, statutes, and case law, have been established. *See Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981); *see also United States v. Wiebe*, 733 F.2d 549, 553 (8th Cir. 1984) (citing *Collins v. Loisel*, 259 U.S. 309, 315 (1922)). If any evidence is offered by the fugitive, the Court rules on its admissibility. Once the evidentiary record is complete, the Court should make written findings of fact and conclusions of law as to each of

6

the elements for certification, including separate findings for each offense as to which extradition is sought. Then, the Secretary of State, and not the Court, decides whether the fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Eain*, 641 F.2d at 508. "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. *See Venckiene v. United States*, 929 F.3d 843, 848 (7th Cir. 2019) (summarizing extradition procedure); *Eain*, 641 F.2d at 508 (same). If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and must commit the fugitive to the custody of the U.S. Marshal's Service to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue [a] warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see also Eain*, 641 F.2d at 508.

In fulfilling its function under Section 3184, a judge should liberally construe the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country. *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 14 (1936); *Factor v. Laubenheimer*, 290 U.S. 276, 301 (1933). Accordingly, the treaty "should be construed more liberally than a criminal statute or the technical requirements of criminal procedure." *Factor*, 290 U.S. at 298. The United States does not expect foreign governments to be versed in our criminal laws and procedures. *Grin v. Shine*, 187 U.S. 181, 184 (1902). Thus, "[f]orm is not to be insisted upon beyond the requirements of safety and justice." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925).

## B. The Requirements for Certification Are Satisfied

The Court should certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought. *See*, *e.g.*, *Venckiene*, 929 F.3d at 849; *In re Extradition of Ortiz*, 444 F. Supp. 2d 876, 881-82 (N.D. Ill. 2006). The following sections discuss these requirements.

### 1. This Court Has Authority Over the Proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court

of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. Both magistrate judges and district judges may render a certification under 18 U.S.C. § 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993); *see also In re Mazur*, No. 06 M 295, 2007 WL 839982, at *1 (N.D. Ill. Mar. 25, 2007) (explaining that the Old General Rule 1.70(b)(1)(j) specifically authorized magistrates to hear foreign extradition cases and that its replacement, Local Criminal Rule 5.1, "though not as specific as the old rule, nonetheless authorizes magistrate judges to perform the duties spelled out in § 3184"). This Court is therefore authorized to conduct the hearing in this case.

### 2. This Court has Jurisdiction over Tautvydas

The Court has jurisdiction over a fugitive, such as Tautvydas, who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged."). Tautvydas was arrested by members of the United States Marshal's Service in the Northern District of Illinois. Therefore, this Court has jurisdiction over him.

### 3. The Treaty is in Full Force and Effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See id.*; *see also United States v. Nolan*, 651 F. Supp. 2d 784, 790 (N.D. Ill. 2009) (noting that "[e]xtradition is only proper where, as here, there is a treaty in force between the requesting country and the United

States"). Attached hereto as Exhibit A is a declaration from Tom Heinemann, an attorney in the Office of the Legal Adviser for the Department of State, attesting that there is a treaty in full force and effect between the United States and Lithuania. The Court must defer to the Department of State's determination in that regard. *See Nolan*, 651 F. Supp. 2d at 793; *see also, e.g.*, *Arias v. Warden*, 928 F.3d 1281, 1286 (11th Cir. 2019) ("[C]ourts must defer to the determination of the executive branch in deciding whether an extradition treaty remains in force." (emphasis in original, internal quotation marks omitted)).

4.   The Charged Crimes Are Covered by the Treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. Here, Article 1 of the Extradition Treaty requires the United States to extradite to Lithuania a fugitive charged with or convicted of an "extraditable offense," as that term is defined under the Extradition Treaty. The documents submitted by the Lithuanian authorities establish that Tautvydas has been charged in Lithuania with Criminal Association; Unlawful Possession of Narcotic or Psychotropic Substances for the Purpose of Distribution Thereof or Unlawful Possession of a Large Quantity of Narcotic or Psychotropic Substances; and Smuggling. Article 2 of the Extradition Treaty defines an offense as extraditable if it is punishable under the laws of both the United States and Lithuania by deprivation of liberty for a period of more than one year or by a more severe penalty.

In assessing whether the crime for which extradition is requested is covered by the Extradition Treaty, the Court should examine the description of criminal conduct provided by Lithuania in support of its charges and decide whether that conduct would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states, if such conduct had been committed here. *See, e.g.*, *DeSilva v. DiLeonardi*, 125 F.3d 1110, 1114 (7th Cir. 1997); *see also Ortiz*, 444 F. Supp. 2d at 883 ("In assessing the duality of the crimes charged in an extradition proceeding, the Court may refer to either the federal or state law of the United States."). A requesting country need not establish that its crimes are identical to ours. *DeSilva*, 125 F.3d at 1113 ("If there is probable cause to believe that [the fugitive and his co-conspirators] committed a crime in Canada, and there is probable cause to believe that the conduct would have been criminal if committed in the United States, then extradition is appropriate. This is the 'dual criminality' requirement."). Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions." *Collins*, 259 U.S. at 312; *see also* Extradition Treaty, Article 2(3)(a). As long as "the acts of the accused are considered criminal in both nations, extradition follows even if the requesting country does not have a criminal statute analogous to the one that makes the acts criminal in the United States." *DeSilva*, 125 F.3d 1113.

As noted above, this Court should liberally construe the Extradition Treaty in order to effectuate its purpose: the surrender of fugitives to the requesting country. *Factor*, 290 U.S. at 298-300; *see also, e.g., Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) (stating that "default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition"). Accordingly, because extradition treaties should be "interpreted with a view to fulfill our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

Tautvydas's conduct, as described in the documents the Lithuanian authorities provided, satisfies the Extradition Treaty's dual criminality requirement. Lithuania requests Tautvydas's extradition for three offenses, all of which the State Department determined are offenses covered under the Treaty. Ex. A at 1, ¶ 5.

*First*, as set forth in the extradition request, all of the Lithuanian offenses are punishable in Lithuania by terms of imprisonment exceeding one year. (Exh. B at 4.) Specifically, the extradition request sets out that, under Lithuanian law, Criminal Association is punishable by imprisonment (for participants) for a period of six to twenty years or a term of life or (for organizers) for a period of ten to twenty years or a term of life; Unlawful Possession of Narcotic or Psychotropic Substances for the Purpose of Distribution Thereof or Unlawful Possession of a Large Quantity of Narcotic or Psychotropic Substances is punishable by imprisonment for a period of

12

ten to fifteen years; and Smuggling is punishable by a term of imprisonment for a period of three to ten years. (*Id.*)

*Second*, the conduct underlying Lithuania's charges would be sufficiently punishable had it been committed in the United States. Regarding the conduct underlying the Criminal Association count, Lithuania alleges that Tautvydas organized the OCG, which is a criminal association with numerous members involved in drug trafficking, and that members of the OCG possessed firearms, explosives or explosive materials.[3] The same alleged conduct, if committed in the United States, would be criminal and punishable by more than one year of imprisonment under 18 U.S.C. § 371 (conspiracy), which charge carries a maximum term of imprisonment of five years, and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846 (drug conspiracy), which charge carries a maximum term of imprisonment of up to 20 years.[4]

A similar analysis applies to the conduct underlying the drug possession count. Lithuania alleges that Tautvydas acted in concert with others to acquire and transport approximately 3,480 kilograms of hashish. The same alleged conduct, if committed in the United States, would be criminal and punishable by more than one year of imprisonment under 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846 (possession

---

[3] As described in the extradition request, law enforcement in Lithuania seized two pistols and 9 mm Luger type ammunition in a garage in Lithuania belonging to one of the members of the OCG. (Exh B, at 12.)

[4] Article 2(3)(b) of the Extradition Treaty states that elements that relate solely to establishing federal jurisdiction in U.S. courts are irrelevant for purposes of determining whether an offense is extraditable. Exh. A at 9, ¶ 2(3)(b).

with the intent to distribute hashish, and conspiracy to commit the same), which charge carries a maximum term of imprisonment of up to 20 years.

Finally, with respect to the Smuggling count, Lithuania alleges that Tautvydas acted in concert with others to transport, across the state border of Lithuania, narcotic or psychotropic substances. (Exh. B, at 4.) The same alleged conduct, if committed in the United States, would be criminal and punishable by more than one year of imprisonment under 21 U.S.C. § 952 (importation of controlled substances), which charge carries a maximum term of imprisonment of up to 20 years; and 18 U.S.C. § 545 (smuggling goods into the United States), which charge carries a maximum term of imprisonment of up to 20 years.

As stated in the extradition request, the statute of limitations in Lithuania on the charged crimes has not expired. (Exh. B at 14.) Accordingly, the Extradition Treaty covers the offenses for which Lithuania seeks extradition.

5.    The Extradition Request Establishes Probable Cause that Tautvydas Committed the Offenses for Which Extradition Is Sought

The standard of proof to find the evidence "sufficient to sustain the charge" and certify extradition to the Secretary of State pursuant to Section 3184 is the familiar domestic requirement of probable cause. *See Eain*, 641 F.2d at 508. The evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that the [suspect] had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted). The extradition judge's probable cause determination is "not a finding of fact 'in the

14

sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'"  *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981)).

The evidence provided by Lithuania in support of its request for Tautvydas's extradition establishes probable cause that he committed the charged offenses. Specifically, the extradition request describes documentary and other physical evidence gathered and seized by law enforcement, including encrypted text messages involving Tautvydas and other members of the OCG, the seizure of approximately 974 kilograms of hashish in Latvia, and the seizure of firearms in Lithuania. Lithuania's allegations are also based on statements from witnesses.

Based on the investigation, on November 7, 2022, a pre-trial judge in the District Court of Vilnius City, Lithuania, issued a ruling imposing a measure of restraint of arrest against Tautvydas.  (Exh. B, at 115.)  The court granted the Prosecutor General's Office's request to authorize that Tautvydas be remanded in custody, noting that "Tautvydas is suspected of organizing an armed criminal association that carried out trafficking of very large quantit[ies] of narcotic substances and possessed [ ] very large quanti[ties] of narcotic substances," and noting also the "degree of graveness of the criminal offense under investigation." (*Id.* at 124.)

15

The extradition request includes a summary of evidence against Tautvydas, including, among other things:

1.       Statements made by a witness, Jaroslaw Jaskowski, who transported hashish for the OCG between June 2015 and December 2016 between Spain and the Netherlands.  (Exh. B, at 67.)  According to Jaskowski, Tautvydas was "always involved in the loading/unloading of hashish in Spain and money in the Netherlands." (*Id.*)

2.       Photographs of members of the OCG associating with one another, including photographs of Tautvydas with Džeraldas Paulauskas, the primary leader of the OCG.  (Exh. B, at 75.)

3.       Intercepted encrypted text messages sent over Sky Ecc, an encrypted messaging application, including text messages in August 2020 sent by Paulauskas to Tautvydas[5] attaching photographs of hashish (*id.* at 55); text messages in December 2020 between Tautvydas and another individual, Oleg Kravchenko, during which they discussed Tautvydas's trip to Prague to inspect the quality of the hashish the OCG had obtained (*id.* at 57); text messages in January 2021 regarding the acquisition of stone slabs for the purpose of concealing the hashish (*id.* at 58-61); and text messages from February 2021 between Tautvydas and another individual

---

[5] Lithuanian authorities also provided evidence that Tautvydas was the user of the aforementioned Sky Ecc account, including a photograph sent by the account depicting part of a credit card where the name "Nerijus Taut" was visible, and photographs sent by the account depicting Tautvydas's family members and residence.  Additionally, Lithuanian law enforcement authorities listened to a voice message sent through the Sky Ecc account and recognized the voice as belonging to Tautvydas.  (Exh. C, at 6-9.)

regarding the replacement of damaged slabs that were used to conceal the hashish (*id.* at 61-62).

4.      Statements made by a witness, Raimundas Pėčia, the head of the company that supplied the stone slabs to the OCG.  (*Id.* at 62.)  Among other things, Pėčia stated that two individuals approached his company seeking to purchase stone slabs "that would not crumble in the cold and could be exposed to environmental factors."  (*Id.* at 63.)  Additionally, those individuals asked the company to carve a cavity along the entire length of the slab according to specified dimensions.  (*Id.*)  The witness further identified Tautvydas as one of the two men looking to purchase the slabs from the company.  (*Id.*)

5.      The seizure of approximately 974 kilograms of hashish in Latvia in February 2021, and laboratory analyses of the substance confirming the presence of hashish.

Collectively, Lithuania's extradition request supplies ample evidence to establish probable cause.  In sum, several witnesses provided statements implicating Tautvydas in drug trafficking, including specifically a shipment of hashish concealed in stone slabs in late 2020; intercepted text messages and witness testimony also revealed that Tautvydas was an organizer and leader of the OCG and was personally involved in the movement of large quantities of hashish across Europe; and this information was corroborated by the seizure of the hashish shipment in February 2021.

Accordingly, there is probable cause in the extradition request that Tautvydas committed the crimes charged.

## C. Documentary Evidence Submitted by Lithuania is Alone Sufficient for Certification

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination is reserved for the foreign court. *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901). Accordingly, an extradition hearing is not a criminal proceeding, *see, e.g.*, *DeSilva v. DiLeonardi*, 181 F.3d 865, 868 (7th Cir. 1999), and it is governed by "the general extradition law of the United States and the provisions of the Treaty," *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987).

The Federal Rules of Evidence do not apply to extradition proceedings. *See, e.g.*, *Bovio v. United States*, 989 F.2d 255, 259 n.3 (7th Cir. 1993); *see also* Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition."). Indeed, hearsay evidence is admissible at an extradition hearing, and, moreover, a certification of extraditability is properly based entirely on the authenticated documentary evidence and information provided by the requesting government. *See, e.g.*, *Collins*, 259 U.S. at 317; *Bovio*, 989 F.2d at 259. Nothing more is required, and typically nothing more is provided. *See, e.g.*, *Eain*, 641 F.2d at 509 (sworn witness statements is competent

evidence).  Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing.  Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty."  *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *see also, e.g.*, *Zanazanian v. United States*, 729 F.2d 624, 626-27 (9th Cir. 1984).

The Federal Rules of Criminal Procedure also do not apply to extradition proceedings.  *See Venckiene*, 929 F.3d at 868; *see also* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive.").  Further, Tautvydas has no right to discovery.  *See, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005).

Many constitutional protections applicable in criminal cases do not apply.  For example, a fugitive has no right to cross-examine witnesses who might testify at the hearing, *see, e.g.*, *In re Extradition of Jarosz*, 800 F. Supp. 2d 935, 939 (N.D. Ill. 2011); there is no Sixth Amendment right to a speedy trial, *see, e.g.*, *Ortiz*, 444 F. Supp. 2d at 885 (internal citations omitted); the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see, e.g.*, *id.* (citing *In re Extradition of Powell*, 4 F. Supp. 2d 945, 951 (S.D. Cal. 1998)); *Collins v. Loisel*, 262 U.S. 426, 429 (1923); the exclusionary rule is not applicable, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see, e.g.*, *Bingham*, 241 U.S. at 517.

Relatedly, Tautvydas's right to present evidence is severely constrained.  Tautvydas may not introduce evidence that contradicts the evidence submitted on

behalf of the requesting country, but rather may only introduce evidence explaining the submitted evidence. *See Charlton v. Kelly*, 229 U.S. 447, 461-62 (1913); *Venckiene*, 929 F.3d at 858 ("An accused in an extradition hearing has no right to contradict the demanding country's proof or to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof.") (quoting *Eain*, 641 F.2d at 511); *Ortiz*, 444 F. Supp. 2d at 884. A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)). The admission of explanatory evidence is largely within the discretion of the Court. *See In re Extradition of Markey*, No. 3:09-mj-75 CAN, 2010 WL 610975, at *3-4 (N.D. Ind. Feb. 18, 2010). In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See, e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"). These issues, which require factual or credibility determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

### D. Rule of non-inquiry

All matters raised by the fugitive as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court. *See* 18 U.S.C. §§ 3184, 3186. The Secretary may take into account humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the requesting country. *See Venckiene*, 929 F.3d at 860; *In*

20

*re Extradition of Salas*, 161 F. Supp. 2d. 915, 927 (N.D. Ill. 2001). This is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *See In re Kaine*, 55 U.S. 103, 110 (1852). Similarly, a fugitive's contention that the extradition request is politically motivated, or that the requesting state's justice system is unfair, should be addressed by the Secretary of State, not the Court. *Prasoprat*, 421 F.3d at 1016 (extradition judge does not have authority to consider humanitarian objections to extradition); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of requesting state is a matter for consideration by the executive branch).

## IV. CONCLUSION

For the foregoing reasons, the United States requests that the Court conduct a hearing pursuant to 18 U.S.C. § 3184 to determine that Lithuania's request for Tautvydas's extradition is sufficient to sustain the charges under the provisions of the applicable treaty and to certify the extradition of Tautvydas for those charges to the Secretary of State for possible surrender to Lithuania.

DATE: February 10, 2023

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:   /s/ Jonathan L. Shih
Jonathan L. Shih
Assistant United States Attorney
219 S. Dearborn Street, Rm. 500
Chicago, Illinois 60604
(312) 353-5361