UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF NERIJUS TAUTVYDAS | ) ) ) ) ) ) ) No. 22 CR 615<br><br>Magistrate Judge Young B. Kim<br><br>July 5, 2023 |

**MEMORANDUM OPINION and ORDER**

The Republic of Lithuania seeks the extradition of Nerijus Tautvydas pursuant to the Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Lithuania, U.S.-Lith., Oct. 23, 2001, S. TREATY DOC. NO. 107-4 (2002), and the Protocol on the Application of the Agreement on Extradition Between the United States of America and the European Union to the Extradition Treaty between the Government of the United States of America and the Government of the Republic of Lithuania, U.S.-Lith., June 15, 2005, S. TREATY DOC. No. 109-13 (2006) (together, "the Extradition Treaty"). Under the Extradition Treaty, the United States and Lithuania agreed to execute "the provisional arrest and detention of alleged fugitives pending the submission of a formal request for extradition and supporting documents." (R. 1, Crim. Compl. at 2.)

Lithuania seeks to prosecute Tautvydas for three crimes: (1) Criminal Association, in violation of Articles 249(3) and 25(4) of the Criminal Code of the Republic of Lithuania ("CCL"); (2) Unlawful Possession of Narcotic or Psychotropic Substances for the Purpose of Distribution Thereof or Unlawful Possession of a

Large Quantity of Narcotic or Psychotropic Substances, in violation of CCL Article 260(3); and (3) Smuggling, in violation of CCL Article 199(4). (R. 25, Govt.'s Mem. at 2.) Tautvydas offers no arguments in opposition to the extradition request in his response to the petition. (See R. 40, Tautvydas's Resp. at 1-2.) Based on the submissions before the court and the hearing held on June 29, 2023, the court grants the government's petition and certifies Tautvydas's extradition to the United States Secretary of State:

## Procedural Background

Lithuania formally charged Tautvydas for the abovementioned CCL violations by Prosecutor's Resolution on November 4, 2022, and a judge in the District Court of Vilnius City, Lithuania issued an arrest warrant for Tautvydas on November 7, 2022. (R. 25, Govt.'s Mem. at 2.) On November 21, 2022, the United States filed a criminal complaint and supporting documents in furtherance of Tautvydas's extradition under 18 U.S.C. § 3184. (R. 1, Crim. Compl. at 1.) The court in response issued a warrant for Tautvydas's arrest, (R. 5), and the government took him into custody the following day, (R. 6). The court then ordered his detention pending further action. (R. 7, 37.) The parties briefed the issues related to the government's petition for extradition, and the court held a hearing on June 29, 2023.

## Background

Lithuanian authorities submitted certified documents from the Prosecutor General's Office of Lithuania supporting allegations against Tautvydas for

participating in *Džerkiniai*—an organized criminal group (the "OCG"), unlawful possession of a large quantity of hashish with the intent to distribute, and smuggling. (R. 25, Govt.'s Mem. at 2, Exs. A at 1-2, B at 3.) The documents submitted summarize the following evidence: (1) photographs embedded within and summaries of text message conversations transmitted and received by the Sky Ecc system, an encrypted messaging application, regarding dealings of the OCG; (2) witness statements concerning the OCG; (3) summaries of hashish seizures, related laboratory tests performed on the hashish, and descriptions of the vehicles involved in its transport; (4) wiretap recordings of Tautvydas and other OCG members; and (5) police reports from Lithuania and other countries where the OCG operated. (See id. at 16-17, Ex. B at 3.)

Lithuanian authorities allege their evidence demonstrates that in 2014 Tautvydas and his affiliates organized an armed criminal group called *Džerkiniai*, in which Tautvydas served as "a core operational member," for the purpose of smuggling large quantities of drugs. (R. 1, Crim. Compl. at 4-7; R. 25, Govt.'s Mem. Ex. B at 6.) Between 2015 and 2022, while the OCG was active, Tautvydas allegedly "handled a common fund for financing the activities" of the OCG, unlawfully possessed "a large quantity of firearms and ammunition, which he planned to use in the offenses committed by the criminal association," and held periodic meetings during which he and other OCG members would discuss the OCG's plans. (R. 25, Govt.'s Mem. Ex. B at 6.)

Regarding the unlawful possession count, Lithuanian authorities allege that Tautvydas—acting together with Dzeraldas Paulauskas and others—"organized the unlawful possession of a very large quantity of a narcotic substance and organized [its] smuggling to and from the Republic of Lithuania." (Id.)  In doing so, Tautvydas acquired at least 3,480 kilograms of hashish from the Republic of Lebanon, unlawfully stored half of the hashish in the Czech Republic and concealed the other half in hollow stone slabs while transporting them to Latvia.  (Id. Ex. B at 6-8.) While crossing the Polish-Lithuanian and Lithuanian-Latvian borders, Tautvydas and his accomplices circumvented customs.  (Id. Ex. B at 7-8.)  When attempting to transport the hashish through Latvia toward Russia on March 12, 2021, Latvian authorities seized the truck housing the OCG's hashish.  (Id. Ex. B at 9.)  Although Tautvydas allegedly arranged the movement of this cargo, he was not present when the Latvian authorities uncovered the drugs.  (See id. Ex. B at 8-9, 70-72.)

Finally, Lithuanian authorities allege that between November 24, 2020, and October 9, 2021, Tautvydas and others organized the unlawful acquisition of hashish in Spain and smuggled it to Poland and then to Russia "by hiding the narcotic substances in trucks and other vehicles, as well as the unlawful handling of a very large quantity of the narcotic substances in the Russian Federation." (Id. Ex. B at 9.)  This effort was halted in Poland in October 2021, when the driver of the vehicle transporting the hashish was arrested and the hashish was seized.  (Id. Ex. B at 70-72.)

4

**Legal Framework**

The extradition process set out in 18 U.S.C. §§ 3184-3195 "begins when a foreign government makes a formal request to the United States government through diplomatic channels." *Venckiene v. United States*, 929 F.3d 843, 848 (7th Cir. 2019). The United States Department of Justice then files a criminal complaint seeking an arrest warrant for the named defendant. *Id.* at 848-49. Afterward, "[t]he person targeted by the request is entitled to a hearing before a judge." *Id.* at 849 (citing 18 U.S.C. § 3184).

The extradition hearing is not subject to the Federal Rules of Evidence or Criminal Procedure, and "the person whose extradition is sought is not entitled to a full trial." *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981). Rather, the probable cause standard applies, meaning that the judge must decide "whether there is competent evidence to justify holding the accused to await trial, and not . . . whether the evidence is sufficient to justify a conviction." *Noeller v. Wojdylo*, 922 F.3d 797, 803 (7th Cir. 2019) (quotations and citations omitted). As such, "[a]n accused in an extradition hearing has no right to contradict the demanding country's proof or to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof." *Id.* at 804 (quotations and citations omitted). "Ultimately, the relevant determination is confined to whether a prima facie case of guilt exists that is sufficient to make it proper to hold the extraditee for trial." *See In re Extradition of Lebiedziński*, No. 20 CR 842, 2021 WL 5232735, at *5 (N.D. Ill. Nov. 10, 2021) (internal quotations and citations omitted).

5

In extradition cases, the court determines narrow issues—"whether a valid treaty exists; whether the crime charged is covered by the relevant treaty; and whether the evidence marshaled in support of the complaint for extradition is sufficient under the applicable standard of proof." *Venckiene*, 929 F.3d at 849 (internal quotations and citations omitted). If the court finds in the affirmative on each issue, it "*must* certify the extradition to the Secretary of State." *Id.* (emphasis in original); *see also Noeller*, 922 F.3d at 803 (finding that extradition treaty "should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them") (quotations and citation omitted); 18 U.S.C. § 3184. Thereafter, "[t]he Secretary of State has 'sole discretion to determine whether or not extradition should proceed further with the issuance of a warrant of surrender,'" *Venckiene*, 929 F.3d at 849 (quotations and citations omitted), and may weigh any defenses touching on international relations, such as political motivations or humanitarian concerns, *Noeller*, 922 F.3d at 808.

## Analysis

The relevant statute grants this court jurisdiction to conduct these extradition proceedings. 18 U.S.C. § 3184; *see Lebiedziński*, 2021 WL 5232735, at *2. Furthermore, because Tautvydas was apprehended in this jurisdiction and is now in federal custody within this district, this court has personal jurisdiction to determine whether he is subject to extradition. *See id.* Tautvydas does not challenge the remaining arguments within the government's petition for certification. (See generally R. 40, Tautvydas's Resp.) Therefore, this court's role in

6

these proceedings is to determine whether extradition is proper after analyzing whether "the applicable treaty was in full force and effect," "the crimes for which surrender was requested were covered by the treaties," and "there was competent legal evidence for the decision. *Matter of Extradition of Schumann*, No. 18 CR 283, 2018 WL 4777562, at *2 (N.D. Ill. Oct. 3, 2018) (citation omitted). This court concludes that these requirements are met and Tautvydas is subject to extradition.

**A.    Valid Treaty**

The government submitted a declaration from an attorney adviser in the Office of the Legal Adviser for the Department of State attesting that the Extradition Treaty is in full force and effect between the United States and the Republic of Lithuania. (R. 25, Govt.'s Mem. Ex. A at 1-2.) The court finds that the declaration sufficiently demonstrates that a valid extradition treaty exists between the United States and Lithuania, and Tautvydas makes no contrary argument.

**B.    Dual Criminality**

Extradition may be appropriate where a sworn complaint charges the fugitive "with a crime provided for in the applicable extradition treaty." *In re Rodriguez Ortiz*, 444 F. Supp. 2d 876, 882-83 (N.D. Ill. 2006); *see also* 18 U.S.C. § 3184. Article 2, Section 1 of the Extradition Treaty explains that an offense is extraditable "if it is punishable under the laws in both States by deprivation of liberty for a period of more than one year or by a more severe penalty." (R. 25, Govt.'s Mem. Ex. A at 10.) Article 2, Section 3(a) states that a qualifying offense is extraditable "whether or

7

not the laws in the Contracting States place the offense within the same category of offenses or describe the offense by the same terminology." (Id.)

The government has satisfied the dual criminality requirement here, and again, Tautvydas makes no argument otherwise. Lithuania seeks Tautvydas's extradition for participating in an organized crime group (Count I), unlawful possession of hashish for the purpose of distribution (Count II), and smuggling (Count III). (R. 25, Govt.'s Mem. at 2.) The Lithuanian Ministry of Justice submitted adequate documentation supporting the request, including CCL excerpts describing the offenses and penalties for which Tautvydas is sought. (Id. Ex. B at 4.) For Count I, Tautvydas is wanted under CCL Article 249(2)-(3), which carries a maximum sentence of life imprisonment. (Id.) For Count II, Tautvydas is wanted under CCL Article 260(3), which carries a maximum sentence of 15 years imprisonment. (Id.) Finally, for Count III, Tautvydas is wanted under CCL Article 199(4), which carries a maximum sentence of 10 years imprisonment. (Id.) Because each charge is punishable by more than one year, the first of the dual criminality prongs is met. (See R. 25, Govt.'s Mem. Ex. A at 10.)

Further, the government properly defined the parallel statutes criminalizing Tautvydas's conduct in the United States. With respect to Count I, the government asserts that Tautvydas's conduct would be punishable under 18 U.S.C. § 371 (conspiracy), which carries a maximum sentence of five years imprisonment. This statute criminalizes any conspiracy by two or more persons "to commit any offense against the United States, or to defraud the United States, or any agency thereof in

8

any manner or for any purpose," so long as "one or more of such persons do any act to effect the object of the conspiracy." (R. 25, Govt.'s Mem. at 18.) The factors in this statute sufficiently mirror those in the Lithuanian criminal association charge, which defines criminal association as "three or more persons linked by mutual relations and division of roles or tasks" that "join[ ] together for the commission of a joint criminal act." (Id. Ex. B at 4.)

For Count II, the government asserts that 21 U.S.C. § 841(a)(1) ("it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance"), which carries a maximum sentence of 20 years imprisonment, is the parallel charge. (R. 25, Govt.'s Mem. at 18.) CCL Article 260(3) similarly prohibits the unlawful production, processing, acquisition, storage, forwarding, sale, or other distribution of "a very large quantity of narcotic or psychotropic substances." (R. 25, Govt.'s Mem. at 4.) These two charges clearly run parallel across jurisdictional lines.

Finally, the government posits that Count III, the smuggling charge, is likewise punishable in the United States under 21 U.S.C. § 952, which prohibits the "import[ation] into the customs territory of the United States from any place outside thereof . . . or [the] import[ation] into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I, or any narcotic drug in schedule II, IV, or V of subchapter I" and carries a maximum sentence of 20 years imprisonment. (Id. at 19.) This too is a strong parallel charge to the

9

smuggling charge brought by Lithuania, which is defined as, "[a] person who, without going through the customs control or otherwise avoiding it or without an authorization, transports across the state border of the Republic of Lithuania . . . narcotic or psychotropic substances or precursors of narcotic or psychotropic substances[.]" (R. 25, Govt.'s Mem. Ex. B at 4 (citing CCL Article 199(4)).) The fact that the two statutes reference different jurisdictions is not material to this court's analysis. *See* Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Lithuania, U.S.-Lith., art. 2, ¶ 3(b), Oct. 23, 2001, S. TREATY DOC. NO. 107-4 (2002). On all counts, the government therefore satisfies its obligation to demonstrate dual criminality.

**C.    Probable Cause**

The government argues that the evidence Lithuania submitted in support of its extradition request establishes probable cause that Tautvydas committed the charges alleged, (R. 25, Govt.'s Mem. at 20), an argument that Tautvydas does not challenge, (see R. 40, Tautvydas's Resp.). The probable cause standard requires the court to "make a practical, common sense decision whether, given all the circumstances . . . there is a fair probability that the defendant committed the crime." *Matter of Extradition of Blacha*, No. 22 CR 251, 2023 WL 3997073, at *5 (N.D. Ill. June 14, 2023) (citation omitted). In the extradition context, "probable cause will be found where there is evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the

10

accused's guilt." *In re Extradition of Cruz*, No. 16 CR 283, 2016 WL 6248184, at *3 (N.D. Ill. Oct. 26, 2016) (internal quotation and citation omitted).

Hearsay evidence can be used to support a probable cause finding because, as discussed, an extradition proceeding is not a trial and the Federal Rules of Evidence do not apply. *Bovio v. United States*, 989 F.2d 255, 259 (7th Cir. 1993). The court thus may rely on accomplice testimony in finding probable cause, and because issues of credibility are to be determined at trial, an extraditee is not entitled to challenge the credibility of accomplice statements submitted by the requesting country. *Id.*; *see also Eain v. Wilkes*, 641 F.2d 504, 510 (7th Cir. 1981) (noting that accomplice "evidence may be of particular importance in extradition cases where all the alleged criminal activity occurred in a distant country"). Accordingly, although extraditees may introduce evidence that explains or clarifies the requesting country's evidence, they are not entitled to introduce evidence that conflicts with it. *See Collins v. Loisel*, 259 U.S. 309, 315-17 (1922); *Eain*, 641 F.2d at 511. In short, "the defendant's right to challenge the evidence introduced against him is quite limited." *Rodriguez Ortiz*, 444 F. Supp. 2d at 884. That said, in relying on affidavits or accomplice testimony in an extradition proceeding, the court must ensure that the evidence has sufficient indicia of reliability to support probable cause. *Id.*

After reviewing the documents Lithuania submitted and considering the parties' submissions, the court concludes that the government's evidence is sufficient to support a finding of probable cause for each of the three counts. First,

11

witness testimony supports the Lithuanian government's allegation that Tautvydas at least associated with and participated in the OCG. Witness Jaroslaw Jaskowski—who transported hashish on behalf of the OCG between June 2015 and December 2016—stated during an interview with Lithuanian authorities that Tautvydas was "always involved in the loading/unloading of hashish in Spain and money in the Netherlands," confirming Tautvydas's association with the OCG. (R. 25, Govt.'s Mem. at 21, Ex. B at 67.) Additionally, the certified documents describing an official police report—No. 38-2(DS0-5246_RN) (Oct. 24, 2022)—indicate that OCG members "paid a fixed amount" into the OCG cash fund for purposes of funding their criminal activities and paying defense fees and living costs to members serving prison sentences. (Id. Ex. B at 51.) The same police report indicates that Tautvydas paid into the fund. (Id.) Finally, there is ample photographic evidence of Tautvydas associating with other OCG members—including Jonas Sirvydas and Džeraldas Paulauskas—and text messaging with OCG members—including Paulauskas and Mindaugas Svermickas. (Id. Ex. B at 56, 58-61, 75-76.) Witness testimony coupled with verified text messaging[1] provides the court with the "indicia of reliability" necessary to support a probable cause finding. *See Rodriguez Ortiz*, 444 F. Supp. 2d at 884.

Encrypted text messages demonstrate Tautvydas's personal involvement in the transportation of thousands of pounds of hashish across Europe, which was

---

[1] The Prosecutor General's Office of Lithuania worked with French authorities to inspect the encrypted text messages sent via Sky Ecc. (R. 25, Govt.'s Mem. Ex. B at 12, 68.) The inspection confirmed that Tautvydas used the platform and that he sent and received the messages cited in this opinion. (Id.)

corroborated by criminal reports detailing Latvian authorities' seizure of cannabis resin from an OCG affiliate's vehicle. (R. 25, Govt.'s Mem. at 22, Ex. B at 12, 65.) Such evidence supports a finding of probable cause for Count II. In August 2020 Tautvydas and Paulauskas exchanged text messages regarding an upcoming delivery of five tons of hashish, "half of which (2.5 tons) belong[ed] to [them] and will have to be transported." (Id. Ex. B at 55.) The same month, Paulauaskas sent photographs of the hashish to Tautvydas. (Id. Ex. B at 56.) Messages from December 2020 indicate that Tautvydas visited the Czech Republic to test the quality of the hashish delivered there, conferred with hashish dealer Riccardo Marian Rotmann about logistics, and ultimately instructed OCG members to sell the narcotics to the Russian market. (Id. Ex. B at 57.) Lithuanian authorities cite hotel records indicating that Tautvydas stayed in a hotel in the Czech Republic at the time he was testing the quality of the hashish there. (Id.)

    Witness testimony further supports Count II allegations. Raimundas Pečia, who headed the company that provided the stone slabs to the OCG, identified Tautvydas as one of two men who approached him seeking to purchase stone slabs "that would not crumble in the cold and could be exposed to environmental factors" and carved to incorporate a cavity of specified dimension. (Id. at 22, Ex. B at 62-63.) This testimony was corroborated by statements from Tadas Valeckas, another suspect under investigation by the Lithuanian authorities and the person who introduced Svermickas and Tautvydas to Pečia. (Id. Ex. B at 64.)

13

Later text messages further demonstrate Tautvydas's role managing the logistics of transferring hashish out of the Czech Republic. In January 2021 Mindaugas Svernickas sent Tautvydas text messages with photos indicating that the hashish had been loaded onto a semi-trailer truck and was housed within cavities carved into stone slabs. (Id. Ex. B at 58-59.) When the slabs broke during travel, Svernickas sent Tautvydas messages showing the cracks in the slabs, and Tautvydas accordingly arranged for the creation of new slabs. (Id. Ex. B at 62.) The Lithuanian government represents that it has documents from the company that created the custom slabs at Tautvydas's request and they "will be used to establish the facts (evidence) related to the sales of granite slabs for the winter/spring period of 2021." (Id. Ex. B at 63.) Finally, a summary of the pretrial investigation report states that packages of hashish seized in Latvia in March 2021 matched the photographs of hashish that Paulauskas sent to Tautvydas in August 2020. (Id. Ex. B at 65.)

This evidence also supports Lithuania's Count III (smuggling). Sky Ecc text messages show that hashish in bags identical to those seized in Latvia were seized in Poland in October 2021 in transit from Spain, suggesting that the same OCG member obtained the hashish from the same source. (Id. Ex. B at 72.) Significant to this count is the fact that Tautvydas assisted in the transportation of hashish across the Polish-Lithuanian and the Lithuanian-Latvian borders "without presenting the cargo to customs control and avoiding the control." (Id. Ex. B at 7-8.) Specifically, Tautvydas referred OCG members "to the persons who were able to

14

handle customs clearing." (Id. Ex. B at 8.) In support of the claim, Lithuania cites to "investigative actions of law enforcement officers of Latvia, i.e.[,] searches and inspections, during which customs documents were taken, and, as mentioned before, analysis of SKY data." (Id.)

As detailed here, the evidence against Tautvydas appears to be considerable and largely rooted in text messages verified to have been sent and received by him. (Id. Ex. B at 68.) Given the absence of arguments from Tautvydas asserting that the evidence does not demonstrate probable cause or explaining the evidence in a nature that differs from the government's explanation, the court concludes that probable cause is established, rendering each extradition certification requirement met.

## Conclusion

For the foregoing reasons the court certifies Tautvydas's extradition to the United States Secretary of State. A certified copy of this Memorandum Opinion and Order and Certification of Extradition, together with all formal extradition documents received into evidence, a certified copy of all testimony and evidence taken at the extradition hearing, and a copy of all memoranda of law filed on the issue of extradition, and all other orders of the court, shall be forwarded to the Secretary of State by the Clerk of the United States District Court for the Northern District of Illinois. Tautvydas will remain in the custody of the United States Marshal's Service pending final disposition of this matter by the Secretary of State.

**ENTER:**

_____
**Young B. Kim
United States Magistrate Judge**